

**NAILAH K. BYRD**
**CUYAHOGA COUNTY CLERK OF COURTS**
1200 Ontario Street
Cleveland, Ohio 44113

### Court of Common Pleas

**New Case Electronically Filed: COMPLAINT**
**August 18, 2022 14:31**

By: KYLE A. SHELTON 0092083

Confirmation Nbr. 2631070

ORLANDO BAKING COMPANY                    CV 22 967616

vs.

ONE LIBERTY PROPERTIES, INC.              **Judge:** JOHN D. SUTULA

**Pages Filed:** 8

**IN THE COURT OF COMMON PLEAS**
**CUYAHOA COUNTY, OHIO**

| | | |
|---|---|---|
| ORLANDO BAKING COMPANY | ) | Case No. |
| 7777 Grand Avenue | ) | Judge: |
| Cleveland, OH 44104 | ) | |
| | ) | **COMPLAINT FOR DECLARATORY** |
| Plaintiff, | ) | **JUDGMENT AND BREACH OF** |
| v. | ) | **CONTRACT** |
| | ) | |
| ONE LIBERTY PROPERTIES, INC. | ) | |
| 60 Cutter Mill Road, Suite 303 | ) | |
| Great Neck, New York 11021 | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff Orlando Baking Company ("Orlando"), by and through its undersigned attorneys, for its Complaint against Defendant One Liberty Properties, Inc. ("One Liberty"), alleges, on knowledge as to its own actions, and otherwise on information and belief, as follows:

## PRELIMINARY STATEMENT

1.      This action concerns a lease dispute in which defendant One Liberty has unreasonably insisted upon repairs and upgrades to real property it leased to Orlando. Although the lease required Orlando to keep the leased premises in good condition and repair, it did not require Orlando to upgrade and replace functioning aspects of the premises simply because One Liberty desired to upgrade the premises to improve the property's sale value. Nor did the lease require Orlando to replace or repair issues that existed well before Orlando took possession of the premises and were in need of repair for reasons unrelated to Orlando's use of the leased premises. Although Orlando offered to repair and replace certain items identified by One Liberty, Orlando was precluded by One Liberty from completing those repairs as One Liberty insisted that Orlando pay it cash for the repairs rather than perform them.

2.     In May 2022, One Liberty sold the leased premises and no longer is the title

holder to the premises that are the subject of the lease.  One Liberty also assigned the lease to the

buyer, such that One Liberty neither owns the lease premises nor is the landlord under the

subject lease.

3.     In this action, Orlando seeks a declaratory judgement regarding the parties'

respective rights and obligations under the lease and declaring that Orlando is not obligated to

repair or replace functioning components of the leased premises, is not required to repair or

replace preexisting conditions at the leased premises, that the items identified by One Liberty as

"deficiencies" are not Orlando's responsibility to repair or replace, and that Orlando fulfilled its

obligations under the lease by offering to repair or replace certain items at the leased premises

which One Liberty unreasonably and unjustifiably refused to allow Orlando to perform.

Additionally, Orlando seeks damages for One Liberty's breach of the lease by failing to perform

certain work on the West Side Refrigeration System as required by the lease, thereby causing

Orlando to incur significant costs and expenses in completing the work and remedying damage

caused by One Liberty's failure to do so.

## PARTIES, JURISDICTION AND VENUE

4.     Orlando is a corporation organized and existing under the laws of the State of

Ohio with a principal place of business located in Cuyahoga County, Ohio.

5.     Upon information and belief, One Liberty is a corporation organized and existing

under the laws of the State of Maryland with a principal place of business located in Great Neck,

New York.

6.      This Court has personal jurisdiction over One Liberty under R.C. §2307.382 and Civ.R. 4.3(1), (6) because One Liberty has conducted substantial business in this state and contracted to lease real property to Orlando in this state.

7.      Venue in Cuyahoga County is proper under Civ.R. 3(C)(3) because One Liberty conducted activity in this County giving rise to the claims in this Complaint and Civ.R. 3(C)(7) because Orlando resides in this County.

## FACTUAL BACKGROUND

8.      On or about November 3, 2017, Orlando and One Liberty entered into a Lease Agreement (the "Lease") by which Orlando agreed to lease the real property located at 6660 Broughton Avenue, Columbus, Ohio (the "Premises") from One Liberty. A true and accurate copy of the Lease is attached here as **Exhibit 1**.

9.      The Lease is designated as a triple net lease under which One Liberty "shall not be required to provide any services, make any repair, or do any act in connection with the Premises" except for an obligation to ensure that "all components of the existing [West Side] [R]efrigeration [S]ystem ... shall be in working order and condition" on the commencement date of the Lease.

10.      The Lease further designates that Orlando is otherwise responsible for ordinary and routine repairs to the Premises:

> [Orlando] shall, at all times during the Term and at [Orlando's] sole cost and expense, maintain, repair, and make replacements to the Premises to keep same at all times in good condition and repair, including, but not limited to, all required maintenance, repair and replacements to the roof of the Premises, the building's foundation system and all structural portions of the building located on the Premises, maintaining and repairing all electrical and gas lines and all other structural and non-structural repairs and replacements to the Premises and all building systems servicing the Premises of whatever kind and nature and however arising, whether foreseeable or unforeseeable, and at the Expiration Date or sooner termination of the Term of this Lease, [Orlando] shall yield and deliver the

same to Landlord in good condition and repair and otherwise in the condition required by this Lease.

***

[Orlando] shall keep all aspects of the Premises in good condition throughout the Term including making replacements as and when necessary, shall operate and keep the Premises in a clean and sanitary condition according to all applicable laws and codes and shall maintain the curbs, sidewalks and parking areas that are included in the Premises in good order and repair including without limitation periodic replacement, re-striping and re-surfacing as necessary.

11.     The Lease further provides that if Orlando does not perform its required maintenance, repair, or replacement obligations after 30 days' written notice of a deficiency, One Liberty may perform the repair itself and charge the costs to Orlando.

12.     Finally, at the end of the Lease term, Orlando must surrender the Premises "in good condition and repair (including replacements having been made when necessary) and otherwise in the condition required by [the] Lease."

13.     When Orlando took possession of the Premises, the West Side Refrigeration System was not in working order and condition.  Although One Liberty purportedly performed certain repairs and replacements to the system, unbeknownst to Orlando, such repairs were insufficient and the system continued to suffer from latent issues with its components.

14.     As a result, following Orlando's possession of the Premises, Orlando experienced several issues with the system that necessitated lengthy and costly repairs to the system, the caused consequential failure in the sprinkler system, and that caused Orlando to lose a substantial amount of product as a result of the failure of the sprinkler and flooding of the system.

15.     In total, Orlando incurred losses in excess of $25,000 as a result of One Liberty's failure to deliver the refrigeration system in working order and condition.

16.    Thereafter, in or about 2021, One Liberty sought to sell the Premises to a third-party buyer and negotiated a sale of the Premises to that buyer.

17.    During the course of that transaction, the buyer allegedly raised several issues with the condition of the Premises, issues that had not been previously brought to Orlando's attention and that did not, in any fashion or capacity, render the Premises in poor condition or repair or inhibit the ordinary commercial purpose and use of the Premises.

18.    Nonetheless, on September 2, 2021, One Liberty sent an alleged Notice of Default to Orlando identify several alleged issues that One Liberty claimed evidenced "a failure to keep all aspects of the Premises in good condition and repair throughout the term of the [Lease] as called for in Section 8 of the Lease Agreement." A true and accurate copy of the Notice of Default is attached here as **Exhibit 2**.

19.    Many of the items identified as deficiencies in One Liberty's correspondence are not deficiencies at all, as they do not render the Premises in poor condition or repair, nor do they inhibit the ordinary and intended commercial use of the Premises.

20.    Many of the items identified as deficiencies in One Liberty's correspondence remain functioning components of the Lease Premises.

21.    Many of the items identified as deficiencies in One Liberty's correspondence also predate Orlando's possession and use of the Premises and are in substantially the same condition as they were when Orlando took possession of the Premises.

22.    Moreover, many of the items identified as deficiencies in One Liberty's correspondence are not Orlando's responsibility to repair or replace but are simply matters for which One Liberty sought to achieve a capital improvement on its property at Orlando's subsequent expense.

23.    One Liberty further claimed that as a result of these alleged deficiencies, it "recently has been forced to make a significant price reduction (in excess of $2.3 million) to a prospective purchaser following inspection of the Premises."

24.    Orlando offered to address the remaining few alleged deficiencies in order to resolve any potential dispute, as would be its absolute right under the Lease, but One Liberty, contrary to what the Lease requires, unreasonably and unjustifiably refused to allow Orlando to perform these repairs. Instead, One Liberty demanded only that Orlando compensate One Liberty for the alleged loss in sale price, thereby placing Orlando in the untenable position of paying to repair the premises it occupied but not actually having the repairs (or replacements/upgrades) for which it paid.

## COUNT I
## DECLARATORY JUDGMENT

25.    Orlando incorporates by reference the allegations set forth in paragraphs 1 through 24 of this Complaint as if fully rewritten herein.

26.    There exists a genuine dispute regarding the parties' rights and obligations under the Agreement, specifically regarding the parties' respective rights and obligations relating to the alleged "deficiencies" identified by One Liberty and whether Orlando has any obligation to repair or replace those deficiencies.

27.    Accordingly, pursuant to Revised Code Section 2721.01 *et seq.*, Orlando is entitled to have its right and obligations declared under the Lease.

28.    Specifically, Orlando is entitled to a declaration: (a) that it is not obligated to repair or replace functioning components of the Premises; (b) that it is not required to repair or replace preexisting conditions at the leased premises; (c) that many of the items identified by One Liberty as deficiencies are not Orlando's responsibility or obligation to repair or replace;

(d) that Orlando fulfilled any obligation to repair or replace deficiencies at the Premises by offering to repair or replace them, but One Liberty unreasonably and unjustifiably refused and prevented Orlando from performance; and (e) that Orlando is not obligated to pay One Liberty for any of the alleged deficiencies.

29.     This dispute constitutes a real and justiciable controversy between the parties concerning their rights and obligations in relation to the Lease.

30.     Speedy relief is necessary to preserve the parties' rights in regard to this dispute.

## COUNT II
## BREACH OF CONTRACT

31.     Orlando incorporates by reference the allegations set forth in paragraphs 1 through 30 of this Complaint as if fully rewritten herein.

32.     The Lease constitutes a binding and enforceable contract setting forth the rights and obligations of Orlando and One Liberty.

33.     Orlando has substantially performed, or has unreasonably and unjustifiably been prevented from performing, all of its material obligations under the Lease.

34.     One Liberty failed to perform its obligations by, among other things, failing to ensure that all components of the West Side Refrigeration System were in working order and condition at the time Orlando took possession of the Premises.

35.     One Liberty's failure to perform this obligation constitutes a material breach of the Lease, and such breach caused Orlando to incur loss in the form of expenses and costs necessary to repair the system and restore it to working order and condition.

36.     As a direct and proximate result of One Liberty's breach of the Lease, Orlando has suffered damages in an amount in excess of $25,000, with the exact amount of damages to be proven at trial.

WHEREFORE, Plaintiff Orlando Baking Company prays for judgment against

Defendant One Liberty Properties, Inc. as follows:

A. On Count I (Declaratory Judgment), for a declaration: (a) that Orlando is not obligated to repair or replace functioning components of the Premises; (b) that Orlando is not required to repair or replace preexisting conditions at the leased premises; (c) that the items identified by One Liberty as deficiencies are not Orlando's responsibility or obligation to repair or replace; (d) that Orlando fulfilled any obligation to repair or replace deficiencies at the Premises by offering to repair or replace, but One Liberty unreasonably and unjustifiably refused and prevented Orlando from performance; and (e) Orlando is not obligated to pay One Liberty for any of the alleged deficiencies.

B. On Count II (Breach of Contract), for damages in an amount in excess of $25,000 with the exact amount to be proven at trial;

C. For reasonable attorneys' fees, pre- and post-judgment interest, related expenses, and costs incurred;

D. For any other further legal and equitable relief in favor of Plaintiff, and against Defendant, that this Court deems just and proper.

Respectfully submitted,

BROUSE MCDOWELL

/s/ P. Wesley Lambert
P. Wesley Lambert (0076961)
Kyle A. Shelton (0092083)
BROUSE MCDOWELL
388 S. Main St., Suite 500
Akron, Ohio 44311
Phone: (330) 535-5711
Fax:     (330) 253-8601
wlambert@brouse.com
kshelton@brouse.com

James T. Dixon (0077547)
BROUSE MCDOWELL LPA
600 Superior Avenue East, Suite 1600
Cleveland, OH 44114
T: 216.830.6830 / F: 216.830.6807
jdixon@brouse.com

*Attorneys for Plaintiff Orlando Baking Co.*



**NAILAH K. BYRD**
**CUYAHOGA COUNTY CLERK OF COURTS**
1200 Ontario Street
Cleveland, Ohio 44113

## Court of Common Pleas

**New Case Electronically Filed: COMPLAINT**
**August 18, 2022 14:31**

By: KYLE A. SHELTON 0092083

Confirmation Nbr. 2631070

ORLANDO BAKING COMPANY

vs.

ONE LIBERTY PROPERTIES, INC.

CV 22 967616

**Judge:**  JOHN D. SUTULA

Pages Filed:  30

# LEASE AGREEMENT

LEASE AGREEMENT ("Lease" or "Agreement") dated as of November 3, 2017, by and between ONE LIBERTY PROPERTIES, INC., a Maryland corporation having an address at 60 Cutter Mill Road, Suite 303, Great Neck, New York 11021 (the "Landlord"), and ORLANDO BAKING COMPANY, an Ohio corporation having an address at 7777 Grand Avenue, Cleveland, Ohio 44104 (the "Tenant").

## W I T N E S S E T H :

WHEREAS, Landlord is the owner of certain "Premises" (as hereafter defined) located at 6660 Broughton Avenue, Columbus, Ohio; and

WHEREAS, Tenant desires to lease the Premises from Landlord, and Landlord desires to lease the Premises to Tenant, all upon the terms and conditions herein set forth.

NOW, THEREFORE, in consideration of the mutual premises herein set forth, the sufficiency of which being hereby acknowledged, the parties hereto do hereby agree as follows:

1. **Demise; Delivery Conditions; Term.**

(a)    Landlord hereby leases to Tenant and Tenant hereby leases from Landlord the land, together with all buildings and improvements now or hereafter located thereon, legally described on Exhibit A attached to this Lease and made a part hereof as Exhibit A (collectively, the "Premises"), known as and located at 6660 Broughton Avenue, Columbus, Ohio, subject, to all covenants, restrictions, easements and agreements affecting title to the Premises.  The term of this Lease (the "Term") shall commence on November 3, 2017 (the "Commencement Date") and shall expire on the earlier to occur of (i) November 30, 2021 or (ii) upon the Closing of the transactions contemplated with Tenant's exercise of the Option under Section 13 of this Agreement (the "Expiration Date").  Tenant has no renewal options to further extend the Term of the Lease.

(b)    Landlord shall deliver possession of the Premises to Tenant on the Commencement Date.  Except as expressly provided for in this Lease, the Premises are being delivered to Tenant in its as-is, where-is condition and Landlord shall not be required to perform any work to prepare the Premises for Tenant's occupancy, nor shall Landlord be obligated to pay any tenant improvement allowance or other contribution of any kind in connection with Tenant's occupancy.  Tenant shall, at Tenant's sole cost and expense, apply for and obtain any and all authorizations, permits and approvals issued by government or other municipal agencies as necessary for Tenant to operate Tenant's business at the Premises.  On the Commencement Date, Landlord shall deliver the Premises to Tenant in its as-is, where is condition, except that all components of the existing refrigeration systems servicing the west side of the Premises as identified on the floor plan attached hereto and made a part hereto as Exhibit B (collectively, the "West Side Refrigeration System") shall be in working order and condition on the Commencement Date.  Landlord shall have no other obligations of any kind with respect to the condition of the Premises at delivery.  Tenant acknowledges that Landlord is also in process of completing an insulation upgrade to the West Side Refrigeration System, which upgrade shall be completed by Landlord at Landlord's expense reasonable promptly after the date of this Lease; however same shall have no effect on the Commencement Date or Rent Commencement Date.

-1-


PLAINTIFF'S EXHIBIT 1

(c)    The "Rent Commencement Date" under this Lease shall be November 15, 2017, except that in the event that Landlord is unable to deliver the Premises on the Commencement Date with the West Side Refrigeration System in the condition required by Section 1(b) above (excluding the insulation upgrade, which shall be completed by Landlord reasonably promptly after the date of this Lease), then the Rent Commencement Date shall be extended for such time as may be necessary for Landlord to put the West Side Refrigeration System in such required condition and the Rent Commencement Date shall be delayed day-for-day for the period required for Landlord to put the West Side Refrigeration System in such required condition. Since the Rent Commencement Date is not the first day of a calendar month, a "Lease Year" hereunder shall mean any 12-month period beginning on the first day of the calendar month immediately following the Rent Commencement Date or any anniversary thereof, as applicable, except that the first such Lease Year shall also include the stub period from the Rent Commencement Date to the end of the month in which same occurs (i.e., the stub period of November 15, 2017 through November 30, 2017, resulting in a first Lease Year of November 15, 2017 through November 30, 2018). The second Lease Year shall run from December 1, 2018 through November 30, 2019, and so on.

2.    Net Lease. Except as otherwise specifically set forth in this Lease, this Lease is intended to be, and shall be construed as, an absolutely net-net-net lease, whereby under all circumstances and conditions the Base Rent payable to Landlord shall be a completely net return to Landlord throughout the term of this Lease, and Landlord shall not be required to provide any services, make any repair or do any act in connection with the Premises, and the Base Rent and Additional Rent and Other Expenses under this Lease shall be paid to Landlord without any claim on the part of Tenant for diminution or abatement, and the fact that Tenant's use and occupancy of the Premises, shall be disturbed or prevented by any cause whatsoever shall not in any way suspend, abate or reduce the rental to be paid under this Lease.

3.    Base Rent. The fixed minimum rent payable under this Lease (referred to herein as the "Base Rent") shall be as follows:

(a)    During the first Lease Year, Tenant shall pay to Landlord Base Rent at the rate of THREE HUNDRED FIFTEEN THOUSAND FIVE HUNDRED SEVENTY-THREE AND NO/100 DOLLARS ($315,573.00) per annum, payable in advance on the first day of each month in monthly installments of TWENTY-SIX THOUSAND TWO HUNDRED NINETY-SEVEN AND 75/100 DOLLARS ($26,297.75), without notice, demand or setoff, except that Base Rent for the stub period from the Rent Commencement Date through the final day of the month in which the Rent Commencement Date occurs (i.e., from November 15, 2017 through November 30, 2017) at the rate of $876.59 per diem is due and payable simultaneously with Tenant's execution of this Lease.

(b)    During the second Lease Year, Tenant shall pay to Landlord Base Rent at the rate of SIX HUNDRED THIRTY-ONE THOUSAND ONE HUNDRED FORTY-SIX AND NO/100 DOLLARS ($631,146.00) per annum, payable in advance on the first day of each month in monthly installments of FIFTY-TWO THOUSAND FIVE HUNDRED NINETY-FIVE AND 50/100 DOLLARS ($52,595.50), without notice, demand or setoff.

(c)    During the third Lease Year, Tenant shall pay to Landlord Base Rent at the rate of SIX HUNDRED FIFTY THOUSAND EIGHTY AND 38/100 DOLLARS ($650,080.38) per annum, payable in advance on the first day of each month in monthly installments of FIFTY-FOUR THOUSAND ONE HUNDRED SEVENTY-THREE AND 37/100

-2-

DOLLARS ($54,173.37), without notice, demand or setoff.

(d)        During the fourth Lease Year, Tenant shall pay to Landlord Base Rent at the rate of SIX HUNDRED SIXTY-NINE THOUSAND FIVE HUNDRED EIGHTY-TWO AND 79/100 DOLLARS ($669,582.79) per annum, payable in advance on the first day of each month in monthly installments of FIFTY-FIVE THOUSAND SEVEN HUNDRED NINETY-EIGHT AND 57/100 DOLLARS ($55,798.57), without notice, demand or setoff.

(e)        All Base Rent shall be payable by Tenant in lawful money of the United States which is legal tender for payment of all debts and dues, public and private, at the time of payment, or by check subject to collection, at the office of Landlord set forth in Section 19 below or such other place as Landlord may designate, without notice or demand, and without any setoff or deduction whatsoever. All other sums payable by Tenant under this Lease shall be deemed "Additional Rent" under this Lease and Landlord shall have the same remedies in case of default in the payment thereof as Landlord has in the case of default in the payment of Base Rent.

4.        **Real Estate Taxes and Other Expenses.**

(a)        Tenant shall, from and after the Rent Commencement Date and thereafter at all times during the Term of this Lease, pay and discharge punctually, or cause to be paid and discharged punctually as and when the same shall become due and payable (i) all taxes, special and general assessments, water rents, rates and charges, sewer rents and other governmental impositions and charges of every kind and nature whatsoever, extraordinary as well as ordinary (collectively, "Taxes"), and each and every installment thereof which shall or may during the Term of this Lease be charged, levied, laid, assessed, imposed or become due and payable, with respect to the Premises, or any part thereof, or any buildings, appurtenances or equipment owned by Tenant or Landlord thereon or therein or any part thereof, together with all interest and penalties thereon under or by virtue of all present or future laws, ordinances, requirements, orders, directives, rules or regulations of the federal, state, county, town and city governments and of all other governmental authorities whatsoever. For the Taxes fiscal year in which the Rent Commencement Date occurs, and the Taxes fiscal year in which the Expiration Date occurs, the total Taxes due for each such year shall be prorated and apportioned between Landlord and Tenant on the basis of the Rent Commencement Date and Expiration Date, as applicable. Tenant shall furnish to Landlord official receipts or other satisfactory proof of all Taxes due within 10 days of the due date applicable thereto. Notwithstanding the foregoing, if requested by Landlord or if required by Landlord's mortgage lender, Tenant shall be required to escrow for Taxes in advance in monthly installments, in which event Landlord shall notify Tenant of such requirement in writing and thereafter Tenant shall pay such Taxes and assessments requested to be escrowed to Landlord in advance on a monthly basis in such sums as required by Landlord. The amount of monthly payments to be made by Tenant hereunder will be estimated by Landlord based on then-existing Taxes and Landlord's good faith estimate of increases applicable thereto, and Tenant shall pay such estimated amount in advance directly to Landlord monthly as aforesaid, as Additional Rent. If at the end of a Tax fiscal period the monthly payments made by Tenant during such period shall be less than the actual amount of Taxes due then Tenant shall pay such deficiency to Landlord (or Landlord's mortgagee, if said mortgagee so requires) within ten (10) days after written request. If Tenant's monthly payments shall exceed the actual amount of such Taxes then such excess shall be applied against the next payment(s) due from Tenant pursuant to this Section.

(b)        Should any governmental authority having jurisdiction impose any tax or assessment against Landlord partially or totally in substitution for or replacement of Taxes, then

-3-

same shall be deemed to be Taxes for purposes of this Section 4 and Tenant shall pay same as Additional Rent hereunder; however, in no event shall Taxes ever include any excise, franchise or commercial activities, grantor's, recordation, net income, inheritance, estate, succession, transfer, income, gift or profit tax, or any business, professional or occupational tax. Should any governmental authority having jurisdiction impose an excise tax or rent tax payable on the rental payable by Tenant under this Lease, then such rent tax shall be Tenant's responsibility and if paid by Landlord shall be reimbursed to Landlord by Tenant as Additional Rent within ten (10) days after submission of a bill for same by Landlord to Tenant.

     5.     <u>Use</u>. (a) Subject to the Tenant's compliance with all applicable laws, ordinances, rules, regulations and other legal requirements affecting the Premises or any portion thereof, Tenant shall use the Premises solely as a warehouse and distribution center for frozen food and bakery products and uses incidental thereto, and for no other purpose.

     (b)     Tenant shall not use or occupy, or permit or suffer the Premises or any part thereof to be used or occupied for any unlawful or illegal business, use or purpose, or in such a manner as to constitute a nuisance of any kind, or for any purpose or in any way in violation of or any present or future governmental laws, ordinances, rules, regulations and other legal requirements.

     6.     <u>Services and Utilities</u>. From and after the Commencement Date, Tenant shall arrange for, and promptly pay when due all amounts and charges for, all services and utilities, including all charges for water, steam, heat, gas, hot water, electricity, light, power and any other service, facility or utility furnished to the Premises during the term of this Lease (collectively, "<u>Other Expenses</u>"). Landlord shall not be required to furnish or render any services or utilities to the Premises, Tenant or any occupant, and shall have no responsibility for any of same. Landlord shall not be liable for any failure to receive any utility service and/or any interruption in the provision of same.

     7.     <u>Alterations; Signs</u>.

     (a)     Except as expressly permitted by the terms of Section 7(b) below, Tenant shall make no changes, additions, improvements, substitutions or decorations in or to the Premises of any nature without Landlord's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed. Any of Tenant's property remaining in the Premises after the Expiration Date or sooner termination of this Lease shall be deemed abandoned by Tenant and Landlord may dispose of the same at Tenant's expense.

     (b)     Tenant may, from time to time during the Term of the Lease, at its own expense, make such interior, non-structural alterations, additions or modifications to the Premises as it deems necessary or desirable. Any alterations to be made by the Tenant affecting the structural portions of the building shall be made only with the prior written consent of Landlord, which consent may be withheld by Landlord in Landlord's sole discretion, and any alterations to be made by the Tenant affecting the exterior but non-structural portions of the building shall be made only with the prior written consent of Landlord, which consent shall not be unreasonably withheld, conditioned or delayed. Tenant shall comply with all applicable laws, orders and regulations in making any alterations or changes to the Premises and shall obtain all required building permits, licenses and other governmental approvals as may be required in connection with same, and shall cause all alterations or changes to be performed in a good and workmanlike, lien-free manner using materials of a similar grade and quality to those then

-4-

existing on the Premises. Landlord agrees to cooperate, at no cost to Landlord, with Tenant in obtaining any permits, applications or licenses to the extent reasonably necessary in connection with any permitted alterations or modifications to be performed by Tenant. Any trade fixtures, equipment, signs or other personal property however attached to or incorporated in the Premises installed by Tenant shall remain Tenant's property, and Tenant shall remove such personal property before the Expiration Date or sooner termination of this Lease, and Tenant shall repair any damage caused by such removal, which obligation shall survive termination of this Lease.

(c)     Subject to compliance with all applicable federal, state and local laws, ordinances, rules and regulations and with the terms of any document of record against the Premises, Tenant may erect one or more identification sign or signs on the exterior of the Premises. All permits and licenses for such signs shall be obtained and paid for by Tenant. Tenant shall at all times maintain any sign or lettering, as may be approved, in good condition and shall hold harmless Landlord from injury to persons or property arising from the erection and maintenance of any such sign. Tenant shall have the right to erect and maintain signs of the maximum size permitted by applicable law and governmental regulations upon the Premises and on the exterior walls and fascia of the Premises. All signs installed or erected by Tenant shall comply with all governmental regulations and shall be subject to all governmental approvals.

8.     Maintenance and Repairs; Covenant Against Waste; Inspection.

(a)     Tenant's Maintenance and Repair Obligations: Tenant shall, at all times during the Term and at Tenant's sole cost and expense, maintain, repair and make replacements to the Premises to keep same at all times in good condition and repair, including, but not limited to, all required maintenance, repair and replacements to the roof of the Premises, the building's foundation system and all structural portions of the building located on the Premises, maintaining and repairing all electrical and gas lines and all other structural and non-structural repairs and replacements to the Premises and all building systems serving the Premises of whatever kind and nature and howsoever arising, whether forseeable or unforeseeable, and at the Expiration Date or sooner termination of the Term of this Lease, Tenant shall yield and deliver the same to Landlord in good condition and repair and otherwise in the condition required by this Lease. Tenant shall keep all aspects of the Premises in good condition throughout the Term including making replacements as and when necessary, shall operate and keep the Premises in a clean and sanitary condition according to all applicable laws and codes and shall maintain all of the curbs, sidewalks and parking areas that are included in the Premises in good order and repair including without limitation periodic replacement, re-striping and re-surfacing as necessary. Tenant shall keep (and make available to Landlord upon Landlord's reasonable request) all records of repair, maintenance or replacement at the Premises. Further, at all times during the Term of this Lease as same may be extended, Tenant shall engage a reputable heating, ventilating and air conditioning (HVAC) contractor and refrigeration contractor, at Tenant's expense, to regularly inspect, maintain and repair the HVAC and refrigeration systems servicing the Premises pursuant to a written service contract for same, which contractor must be reasonably satisfactory to Landlord, and Tenant shall be responsible for all repairs made to the HVAC and refrigeration systems other than as expressly made Landlord's responsibility pursuant to Section 8(b) below. Landlord shall be supplied with copies of the maintenance contract and all renewals of same, and all inspection reports. Tenant shall not perform any acts or carry on (or permit any of its employees, agents or invitees to carry on) any practices which may injure the Premises, and shall not commit or suffer any waste with respect to the Premises. If Tenant does not comply with the provisions of this Section and such failure to comply continues after thirty (30) days written notice of same from Landlord (except in the case of an emergency, in which event no

-5-

such notice shall be required), then same shall constitute an Event of Default by Tenant under this Lease and, in addition to Landlord's other rights and remedies with respect to such default, Landlord may (but shall not be obligated to) enter upon the Premises and perform any repair, maintenance or replacement which Landlord reasonably deems necessary, in which event Tenant shall pay all costs that Landlord may incur for such repair, maintenance or replacement. Other than as permitted in Section 7 above, Tenant shall not make any other alterations, additions or improvements to the Premises without Landlord's prior written consent and approval, and all alterations, additions or improvements made upon the Premises, except movable furniture and trade fixtures put in at the expense of Tenant, shall be the property of Landlord and shall remain upon and be surrendered with the Premises at the Expiration Date or sooner termination of this Lease.

(b)     Landlord's Maintenance and Repair Obligations:  Landlord shall have no maintenance, repair or replacement obligations with respect to the Premises, all of same being Tenant's sole responsibility at Tenant's sole cost and expense as set forth above. However, and notwithstanding the foregoing, (i) Landlord shall deliver the Premises to Tenant with all components of the West Side Refrigeration System in working order and condition and (ii) solely during the first thirty (30) days of the Term (but not thereafter), Landlord shall be responsible to pay any reasonable cost and expense incurred during such period in connection with making required repairs to the West Side Refrigeration System to maintain same in working order and condition as required up to a maximum expenditure by Landlord of Twenty-Five Thousand Dollars ($25,000.00).

(c)     Tenant shall permit Landlord and the authorized representative of Landlord to enter the Premises at all reasonable times for the purpose of inspecting all or any part thereof, upon reasonable prior notice to Tenant.

9.     Mechanics' Liens.

(a)     Tenant shall not suffer or permit any mechanic's or other liens to be filed against the Premises, or any part thereof, or against Tenant's leasehold estate in the Premises, by reason of any work, labor, services or materials done for, or supplied, or claimed to have been done for, or supplied to, Tenant or anyone holding the Premises or any part thereof through or under Tenant. If any such lien shall at any time be filed against the Premises, Tenant shall promptly notify Landlord and shall take such action as bonding, deposit, payment or otherwise as will cause the same to be discharged of record within thirty (30) days after notice of filing thereof is received by Tenant. If Tenant shall fail to discharge any such lien within such period, then, in addition to any other right or remedy of Landlord, Landlord may, but shall not be obligated to, procure the discharge of record of the same either by paying the amount claimed to be due or by deposit in court or by bond, and Landlord shall be entitled, if Landlord so elects, to compel the prosecution of an action for the foreclosure of any such lien by the lienor (which Landlord may, at its option, elect not to defend or to defend in such manner as Landlord shall determine in its sole discretion) and to pay the amount of the judgment, if any, in favor of the lienor with interest, costs and allowances. Any amount paid or deposited by Landlord for any of the aforesaid purposes, and all legal and other expenses of Landlord, including, without limitation, reasonable counsel fees, in defending any such action or in obtaining the discharge of any such lien, together with interest thereon at the rate of ten percent (10%) per annum, or the then maximum lawful interest rate, whichever shall be less, from the date of payment or deposit, shall be due and payable by Tenant to Landlord promptly as Additional Rent hereunder, which repayment obligation shall survive the expiration or termination of this Lease.

-6-

(b)       Nothing contained in this Lease shall be deemed to be, or construed in any way as constituting, the consent or request of Landlord, express or implied, by inference or otherwise, to any person, for the performance of any labor or the furnishing of any materials for any construction, rebuilding, alteration, improvement, or repair of or to the Premises or any part thereof. Further, Landlord hereby gives notice to all persons who may furnish labor or materials to Tenant at the Premises that Landlord does not consent to the filing of any mechanic's or other lien against Landlord's or Tenant's interest or estate in the Premises, and that all persons furnishing labor and materials to Tenant shall look only to Tenant's credit and such security as Tenant may furnish for the payment of all such labor and materials.

10.       Requirements of Law.  Tenant shall, at its expense, at all times during the Term of this Lease, comply with all present and future laws, orders and regulations of all state, federal, municipal and local governments, departments, commissions and boards and any direction of any public officer pursuant to law affecting the Premises, and/or Tenant's use, occupancy, repair and/or maintenance thereof, and shall keep in full force and effect all licenses and permits which are required or necessary to carry on the operation of Tenant's business at the Premises. Tenant shall, at its sole cost and expense, at all times during the term of this Lease comply with the requirements of insurance authorities, the provision of all insurance policies applicable to the Premises and the requirements of all liens, encumbrances and other matters affecting title to the Premises. Tenant shall pay all costs, expenses, liabilities, losses, damages, fines, penalties, claims and demands, including, without limitation, reasonable counsel fees, that may in any manner arise out of or be imposed because of the failure of Tenant to comply with this Section, which obligation shall survive the expiration of the Term of this Lease.

11.       Subordination.  As of the date hereof, Landlord represents and warrants that there is no Mortgage (hereafter defined) encumbering Landlord's fee interest in the Premises. This Lease shall be subject and subordinate to any mortgage, deed of trust or other lien or similar encumbrance (hereinafter, collectively referred to as a "Mortgage") hereafter affecting Landlord's fee interest in the Premises or any portion thereof, and to any renewals or extensions thereof, provided that Landlord obtains from the holder thereof a subordination, non-disturbance and attornment agreement signed by such holder in such mortgagee's commercially reasonable form, which shall provide among other things that such holder shall not disturb Tenant's right to possession of the Premises and shall not interfere with any other rights granted Tenant under this Lease, in accordance with the terms and conditions hereof, provided Tenant is not in default under this Lease. In confirmation of the foregoing Tenant agrees to execute and deliver such subordination non-disturbance and attornment agreement. The holder of any Mortgage may, upon written notice to Tenant, elect to subordinate its Mortgage to this Lease at any time.

12.       Tenant Defaults; Remedies.  (a) The following shall be deemed events of default by Tenant under this Lease (each, an "Event of Default"):

(i)       Tenant shall fail to pay any installment of Base Rent or Additional Rent or Other Expenses when due and such failure shall continue for a period of ten (10) days after written notice from Landlord; provided that Landlord shall only be obligated to give a maximum of two (2) such default notices in a given Lease Year (and if Tenant fails to pay any such installment when same is due after Landlord has already given two such default notices within the same Lease Year, then for the balance of such lease Year an Event of Default shall occur upon Tenant's failure to pay any such installment within ten days after the due date thereof, without regard to written default notices);

-7-

(ii)     Tenant shall fail to perform any other obligation under this Lease and such failure shall continue for a period of thirty (30) days after written notice from Landlord, or if the default or omission complained of shall be of a nature that the same cannot reasonably be completely cured or remedied within said thirty (30) day period, if Tenant shall not have diligently commenced curing such default within such thirty (30) day period and shall not thereafter with reasonable diligence and in good faith, proceed to remedy or cure such default within a reasonable time under the circumstances;

(iii)    Tenant shall make an assignment for the benefit of creditors or a trustee or receiver shall be appointed for all or substantially all of the assets of Tenant and such appointment is not dismissed or terminated within sixty (60) days; and/or

(iv)    Tenant shall file a petition in bankruptcy under the laws of the United States or such petition shall be filed against Tenant and Tenant fails to vacate or set aside same within sixty (60) days after same is filed.

(b)     Upon the occurrence of an Event of Default, Landlord may exercise any right or remedy available whether under this Lease, at law or in equity, all of which are reserved to Landlord, without further notice to Tenant, except as hereinafter provided, specifically including, without limitation, the following:

(i)     Terminate this Lease in which event Landlord shall have the right to re-enter the Premises, and, if Tenant fails to surrender and deliver the Premises, then Landlord shall have the right to dispossess Tenant and any occupants thereof by summary proceedings upon ten (10) days prior written notice, and without prejudice to any other remedy which Landlord may have, including a suit for possession or arrearages in Base Rent, Additional Rent or Other Expenses;

(ii)    Terminate Tenant's right to possession without terminating the Lease, in which event Landlord shall have the right to re-enter the Premises and, if Tenant fails to surrender and deliver the Premises, then Landlord shall have the right to dispossess Tenant and any occupants thereof by summary proceedings upon ten (10) days prior notice, and without prejudice to any other remedy which Landlord may have.  No re-entry by Landlord shall be deemed a surrender of this Lease;

(iii)   Exercise its self-help remedies referred to in subsection (d) below;

(iv)    Exercise any other right or remedy available to Landlord whether at law and/or in equity, it being understood that each and every of the rights, remedies and benefits available to Landlord shall be cumulative and shall not be exclusive of any other rights, remedies and benefits available to Landlord whether at law, equity or otherwise.

(c)     No re-entry or taking possession of the Premises by Landlord shall be construed as an election on its part to terminate this Lease, unless a written notice of such intention is given to Tenant.  Notwithstanding any such reletting or re-entry or taking possession, Landlord may at any time thereafter elect to terminate this Lease.  Pursuit of any of the foregoing remedies shall not preclude pursuit of any of the other remedies provided in this Lease or by law or in equity, nor shall pursuit of any remedy constitute a forfeiture or waiver of any Base Rent or Additional Rent due to Landlord under the Lease or of any damages accruing to Landlord by reason of the violation of any of the terms provisions and covenants contained in this Lease.  No waiver by Landlord of any violation or breach of any of the terms, provisions, and covenants

-8-

herein contained shall be deemed or construed to constitute a waiver of any other violation or breach of any of the terms, provisions, and covenants contained in this Lease and forbearance by Landlord to enforce one or more of the remedies provided upon an Event of Default shall not be deemed or construed to constitute a waiver of any other violation or default.

        (d)      In the event Tenant fails to perform any of the obligations to be performed by Tenant under this Lease and such breach or failure shall continue beyond the applicable notice and/or cure period in the Lease, then Landlord may, in addition to any other rights or remedies it may have, at its option, cure such default and perform such obligation and incur any reasonable expense as necessary to cure such default and perform such obligation, at Tenant's cost and expense, and bill Tenant for the reasonable costs thereof. In the event Landlord has elected to cure the applicable default and has incurred expenses in doing so as aforesaid, Landlord shall submit written notice to Tenant of the expenses incurred or paid to third parties and Tenant shall reimburse such cost to Landlord within ten (10) days of such notice, plus a ten percent (10%) administrative fee, which reimbursement obligation shall survive the expiration or earlier termination of this Lease.

        13.    **Option to Purchase the Premises.**

        (a)      Provided and on the condition that Tenant shall keep, observe and perform all of the terms, covenants and conditions of this Lease on Tenant's part to be kept, observed and performed, and provided further that at the time of the exercise of the purchase option described in this Section 13 and on the closing date of such purchase Tenant shall not be in subject to an Event of Default under this Lease beyond applicable notice and/or cure periods, Tenant shall have the one-time right to elect to purchase the Premises from Landlord (the "Option") pursuant to the terms and conditions set forth in this Section 13.

        (b)      If Tenant exercises the Option as set forth in this Section 13, the purchase price for the Premises shall be Four Million Seven Hundred Fifty Thousand and No/100 Dollars ($4,750,000.00) (the "Purchase Price").

        (c)      Tenant shall have the right to exercise this Option on no less than ninety (90) days prior written notice to Landlord, but the actual closing of the transfer of title to Tenant must occur during the second Lease Year (the "Option Period"). Such written notice shall also designate the date on which Tenant desires to close on its purchase, which closing date must occur during the second Lease Year. Tenant shall be responsible for managing the timing of its exercise of the Option to accommodate the notice requirement and the requirement of a Closing during the second Lease Year. Tenant shall exercise the Option by providing such written notice to Landlord advising of such exercise, and simultaneously with such exercise Tenant shall deliver to the Title Company, as escrow agent, an earnest money deposit for such purchase equal to $237,500.00 (the "Earnest Money") in immediately available good US funds. If Tenant exercises the Option, then the closing of title would occur on a date designated by Tenant and occurring at any time during the second Lease Year, and the Option shall be of no further force and effect if the purchase of the Premises is not actually closed by Tenant within such second Lease Year. If Tenant exercises the Option but thereafter fails to close within such second Lease Year as a result of the failure of a Condition (hereafter defined), Tenant shall be entitled to, and Title Company shall return the Earnest Money to Tenant.

        (d)      From the Commencement Date and prior to exercising the Option, Tenant at Tenant's sole cost and expense shall have the right to perform any due diligence investigations at the Premises as Tenant deems appropriate in connection with evaluating whether

-9-

or not to exercise same, to examine a title commitment for an owner's fee policy of title insurance for the Premises together with copies of all documents and instruments referred to therein, to obtain a current ALTA survey of the Premises, to examine the condition of the soils of the Premises and to test for hazardous materials at, and other environmental conditions relating to, the Premises including, without limitation, obtaining a Phase I environmental site assessment (but specifically not any invasive testing, which may not be performed without Landlord's prior written consent including consent as to location and scope of any proposed testing), to check for any possible condemnation or other governmental actions which may affect the use of the Premises, to check for any special assessments or impact fees which may be levied against the Premises, and to conduct any other non-invasive investigations, inspections, evaluations, or other non-invasive tests Tenant deems necessary in its sole discretion in determining whether or not to exercise the Option. Landlord shall be obligated to cause the so-called "Standard Exceptions" to be removed from the title policy and shall cause all mortgages, tax liens, judgment liens, or other monetary liens that are caused by the acts or omissions of Landlord (and specifically not by the acts or omissions of Tenant) ("Liens") to be released and removed of record on or before Closing (the Standard Exceptions and Liens are hereinafter collectively referred to as the "Unpermitted Exceptions").

(e)     If the Option is exercised, then at Closing, the Purchase Price shall be paid and Landlord will convey good and marketable title to the Premises to Tenant, or Tenant's designated successor and/or assign, by good and sufficient general warranty deed (the "Deed") free and clear of the Unpermitted Exceptions and subject only to: (a) zoning ordinances affecting the Premises; (b) Taxes and assessments, both general and special, regardless of the status of payment thereof except that any Taxes and assessment installments that pertain to any period prior to the Commencement Date shall be paid by Landlord or credited against the Purchase Price at Closing; (c) all legal highways; and (d) all easements, restrictions, encumbrances and other matters which have been filed of record, which are to be evaluated by Tenant prior to its exercise of the Option. In connection with the transfer of the Premises to Tenant, Landlord shall assign to Tenant all licenses, permits, and approvals necessary to operate the buildings and improvements on the Premises, if any, by way of a quitclaim assignment agreement in a form reasonably acceptable to Tenant and Landlord.

(f)     Tenant's purchase of the Premises pursuant to the Option is expressly conditioned and contingent upon the occurrence of the following (the "Conditions"): (i) to obtain a commitment for any purchase money financing desired by Tenant in an amount and on such terms as acceptable to Tenant in its sole discretion; (ii) the Title Company is in a position to issue an owner's policy of title insurance for the Premises at Closing without exception for Unpermitted Exceptions; and (iii) there has been no material adverse change to the character or condition of the Premises (including the condition of title to the Premises) and no material casualty or material Taking shall have occurred with respect to the Premises (in each case as determined by the parties acting in good faith) from the date of Tenant's exercise of the Option, other than adverse changes that result from the acts or omissions of the Tenant and/or Tenant's agents, employees, contractors or invitees. If the foregoing Conditions have not been satisfied as of the Closing, then Tenant may terminate the Option by written notice to Landlord, in which event Tenant shall receive the Earnest Money and have no further obligation to purchase the Premises (and this Lease will otherwise continue in accordance with its terms and provisions), but if not so terminated then Tenant shall close title and consummate the Option as provided in this Section 13 without reduction in the Purchase Price. If Tenant elects to proceed to Closing notwithstanding a material casualty or material Taking that would have entitled Tenant to terminate the Option as provided above, then in such event (i) if a casualty, then at Closing Tenant will have the right to receive all insurance proceeds (net of collection costs and net of any

-10-

amounts actually applied to restoration of the Premises, if any) payable in respect to such damage or destruction to the Premises upon Closing, but only if the Closing actually occurs as provided in this Section 13 and (ii) if a Taking, then Tenant shall be entitled to participate in any such condemnation or eminent domain proceedings and to receive at Closing all of the proceeds attributable to any portion of the Premises to be so taken (net of collection costs and net of any amounts actually applied to restoration of the Premises, if any), but only if the Closing actually occurs.

(g)     If Tenant exercises the Option, the consummation of the transaction contemplated by this Section shall take place by a so-called escrow closing through the office of the title company of Tenant's choosing, which must be a nationally-recognized title insurance company and specifically not an abstract company (the "Title Company") by no later than the closing date designated in Tenant's Option notice to Landlord, subject to the satisfaction of the Conditions to Closing, unless Landlord and Tenant mutually agree upon a different date (the "Closing"). In no event, however, shall the Closing occur at any time other than during the second Lease Year, time being of the essence with respect to such outside Closing date. Tenant shall continue to maintain occupancy, and all terms and conditions of this Lease shall remain in full force and effect (including Tenant's obligation to pay Base Rent), after the exercise of the Option and until the Closing. At Closing, there shall be no adjustments between the parties since pursuant to this Lease all operating expenses are borne by Tenant during the pre-Closing period; however, any Taxes and assessment installments that pertain to any period prior to the Commencement Date shall be paid by Landlord or credited against the Purchase Price at Closing.

(h)     At Closing, Landlord shall be responsible for paying any costs to release and remove the Unpermitted Exceptions from record and any recording costs in connection therewith. Tenant shall be responsible for any and all other closing expenses in connection with the Option, including without limitation the following costs, notwithstanding any contrary customary allocation of the same in the jurisdiction where the Premises is located: (i) the cost of the title commitment and the cost of the premiums for the owner's fee policy of title insurance; (ii) all escrow fees; (iii) the full amount of all recording fees for the Deed; (iv) all transfer taxes or conveyance fees required by law to be paid at the time of the filing of the Deed; and (v) the cost of any survey. Each party shall pay its own attorneys' fees. The parties agree that the Title Company shall act as escrow agent with respect to the Option transaction, subject to its standard terms and conditions of escrow, which shall include customary and usual terms and provisions of escrow including terms and provisions governing the disposition of the Earnest Money.

(i)     Landlord shall promptly provide Tenant with written notice if Landlord receives notice or otherwise discovers that a Taking is or will be affecting the Premises.

14.     **Entry by Landlord.**  Landlord reserves the right at all reasonable times and upon at least twenty-four (24) hours prior notice to Tenant to enter the Premises or any portion thereof to inspect the premises and the state of repair thereof, to show the Premises to prospective purchasers or mortgagees (or, twelve (12) months prior to the Expiration Date, to prospective tenants), and/or to post notices of non-responsibility as determined by Landlord in connection with any work being performed on the Premises. Further, Landlord may (but shall not be obligated to) enter the Premises or any portion thereof at any time to take possession due to any breach of this Lease by Tenant beyond applicable notice and/or cure period in the manner provided herein, perform any covenants of Tenant that Tenant fails to perform in the manner provided herein and/or correct or otherwise deal with any emergency situation. Any entry into the Premises by Landlord in the manner hereinbefore described shall not be deemed to be a

-11-

forcible or unlawful entry into, or a detainer of, the Premises, or an actual or constructive eviction of Tenant from any portion of the Premises.

15.    Underline End of Term.

(a)    Upon the Expiration Date or sooner termination of this Lease, Tenant shall quit and surrender to Landlord the Premises, broom clean and in good condition and repair (including replacements having been made as and when necessary) and otherwise in the condition required by this Lease, and Tenant shall remove all of its personal property from the Premises and repair any resultant damage caused by such removal. Tenant's obligation to observe or perform this covenant shall survive the Expiration Date or sooner termination of this Lease. Upon prior written notice to Tenant delivered at least twenty-four (24) hours in advance, Landlord may enter the Premises during normal business hours to show the Premises to prospective purchasers or mortgagees, or, twelve (12) months prior to the Expiration Date of the Lease, to show the Premises to prospective tenants.

(b)    If the Premises are not surrendered and vacated as and at the time required by this Lease (time being of the essence) at the termination of the Term, same shall not be deemed to extend the term of this Lease, but the tenancy thereafter shall be from month to month and shall be subject to all the other terms and conditions of this Lease, except that in the absence of a written agreement between the parties to the contrary (and in addition to all Additional Rent and Other Expenses under this Lease, which shall continue to be payable by Tenant during such holdover period) Tenant shall pay to Landlord Base Rent for such holdover period at a rate equal to One Hundred Fifty Percent (150%) of the amount of Base Rent in effect for the month immediately preceding the Expiration Date. Tenant shall also be liable to Landlord for all losses, costs, liabilities and damages which Landlord may incur by reason thereof, including, without limitation, reasonable attorneys' fees, and Tenant shall indemnify, defend and hold harmless Landlord against all claims made by any succeeding tenant(s) against Landlord or otherwise arising out of or resulting from the failure of Tenant timely to surrender and vacate the Premises in accordance with the provisions of this Lease.

16.    Underline Quiet Enjoyment. Landlord covenants and agrees with Tenant that upon Tenant paying the Base Rent and Additional Rent and Other Expenses and observing and performing all of the terms, covenants and conditions on Tenant's part to be observed and performed, Tenant may peaceably and quietly enjoy the Premises hereby demised, subject to the terms and conditions of this Lease.

17.    Underline No Waiver. The failure of either party to seek redress for violation of, or to insist upon the strict performance of any covenant or condition of this Lease shall not prevent redress for a violation of, or insistence upon strict performance of, a subsequent act. No waiver of any obligation, term or condition of this Lease shall be of any effect unless made in writing and signed by the party against whom such waiver is asserted. No receipt of money by Landlord from any receiver, trustee or custodian or debtor in possession shall reinstate, continue or extend the term of this Lease or affect any notice given to Tenant or to any such receiver, trustee, custodian or debtor in possession or operate as a waiver or estoppel of the right of Landlord to recover possession of the Premises for any of the causes therein enumerated by any lawful remedy. The receipt by Landlord of rent with knowledge of the breach of a provision of this Lease shall not be deemed a waiver of such breach.

18.    Underline Waiver of Trial by Jury. Landlord and Tenant hereby agree to and do hereby waive trial by jury in any action, proceeding or counterclaim brought by either of the

-12-

parties hereto against the other on any matters whatsoever arising out of or in any way connected with this Lease, the relationship of Landlord and Tenant, Tenant's use of or occupancy of the Premises, and any emergency statutory or other statutory remedy.

19. **Notices.** Any notice or document required to be delivered under this Lease shall be deemed validly given if made in a writing sent to the party to be notified, by personal delivery, overnight delivery by UPS, Federal Express or other nationally-recognized overnight courier or by certified or registered mail, return receipt requested, at the following addresses for such party or such other address that may be given by such party to the other by notice. All notices shall be deemed given on the date of receipt (or refusal thereof) by the intended recipient:

| If to Landlord: | One Liberty Properties, Inc.<br>60 Cutter Mill Road<br>Suite 303<br>Great Neck, NY 11021<br>Attention: Lawrence G. Ricketts |
|---|---|
| with a copy to: | One Liberty Properties, Inc.<br>60 Cutter Mill Road<br>Suite 303<br>Great Neck, NY 11021<br>Attention: Richard M. Figueroa |
| If to Tenant: | Orlando Baking Company<br>7777 Grand Avenue<br>Cleveland, Ohio 44104<br>Attention: John Anthony Orlando |
| with a copy to: | Brouse McDowell L.P.A.<br>388 South Main Street<br>Suite 500<br>Akron, OH 44311<br>Attention: Daniel L. Silfani |

20. **Survival.** Any obligation of either party hereunder which, by its nature or under the circumstances can only be, or by the provisions of this Lease may be, performed after the expiration or earlier termination of this Lease, and any liability for a payment which shall have accrued to or with respect to any period ending at the time of such expiration or termination, shall survive the expiration or earlier termination of this Lease unless expressly otherwise provided in this Lease.

21. **Financial Information.** Within ninety (90) days after the end of each of Tenant's fiscal years during the Term, Tenant shall provide to Landlord consolidated statements of income, retained earnings and cash flows for such fiscal year, and consolidated balance sheets as at the end of such fiscal year, substantially in the same form as delivered by Tenant to Landlord in connection with the consummation of this Lease and certified as true and correct by an officer of Tenant.

22.    Relationship of Parties. Nothing in this Lease shall be deemed or construed to create a relationship of partnership or joint venture between the parties, it being understood that their sole relationship is that of Landlord and Tenant.

23.    Assignment, Subletting and Encumbrances.

(a)    Except as provided below, Tenant shall not sublet (or suffer or permit any other person to occupy) all or any portion of the Premises, or assign, mortgage, pledge or otherwise encumber or hypothecate this Lease whether by operation of law or otherwise, without the prior written consent of Landlord in each instance, which consent may not be unreasonably withheld. Landlord shall have no obligation to provide non-disturbance protection to any subtenant. Each transfer to which Landlord has consented shall be evidenced by a written agreement between Tenant and such assignee/sublessee in form and substance reasonably satisfactory to Landlord, a signed copy of which shall be provided to Landlord within ten (10) days after the effective date of such assignment or subletting (as applicable). Tenant agrees to reimburse Landlord for Landlord's reasonable attorney's fees incurred in connection with the processing of and documentation of each such consent requested, whether or not such transfer is consummated.

(b)    If Landlord shall consent to an assignment or subletting, then notwithstanding any assignment or sublease, the original Tenant named in this Lease shall remain fully and primarily liable on this Lease and shall in no event be released from any of its obligations under this Lease. If this Lease shall be assigned or if the Premises or any part thereof shall be sublet or occupied by any person or persons other than the original Tenant named in this Lease, Landlord may collect rent from any assignee, subtenants and/or occupants and apply the net amounts collected to the rents, Additional Rent and other charges payable by Tenant pursuant to this Lease, but no such assignment, subletting, occupancy or collection shall be deemed a waiver of any of the provisions of this Section, or the acceptance of the assignee, subtenant or occupant as Tenant, or a release of any person from the further performance and observance by such person of the obligations under this Lease on the part of Tenant to be performed. The consent by Landlord to an assignment, mortgage, pledge, encumbrance, hypothecation or sublet shall not be construed to relieve Tenant from obtaining the express consent in writing of Landlord to any further assignment, mortgage, pledge, encumbrance, hypothecation or sublet.

(c)    Notwithstanding but otherwise subject to the provisions of Section 23 (a) and (b), during the Term of this Lease Tenant shall be permitted to sub-let portions of the Premises to third parties for frozen pallet storage only, without the need of obtaining Landlord's consent.

(d)    Any change in 50% or more (in one transaction or a series of related transactions) of the ownership of any of the voting stock, membership interests or partnership interests of Tenant shall be deemed a prohibited assignment under this Lease unless such transfer shall be made to a corporation, limited liability company, partnership or trust which is a parent, subsidiary or affiliate of Tenant (i.e. one which controls, is controlled by, or is under common control with Tenant), or unless Tenant shall have obtained the prior written consent of Landlord as aforesaid.

24.    Estoppel Certificates. Landlord and Tenant shall execute, acknowledge and deliver to the other, within ten (10) days after written request from the requesting party, a written statement in form reasonably satisfactory to both parties stating that as of the date of such statement: (1) the Lease is in full force and effect and has not been assigned,

-14-

modified or amended (or, if it has, then specifying the dates of any such assignment, modification or amendment), (2) the Lease constitutes the full agreement between the parties, (3) to the best knowledge of the certifying party, the other party is not in default in the performance or observance of its obligations under this Lease (or if same is not the case, specifying each such default with specificity) and to the best knowledge of the certifying party, no event has occurred that, with the giving of notice or passage of time, or both, would constitute a default by the other party under this Lease (or, if same is not the case, specifying each such event with specificity), (4) the dates to which Base Rent and Additional Rent payable by Tenant under this Lease have been paid, and (5) the Commencement Date, the Rent Commencement Date, the Expiration Date, and stating any other additional and customary information reasonably requested by the requesting party. Any such statement delivered by Tenant pursuant to this section may be relied upon by any prospective purchaser of the Premises or any then existing or prospective mortgagee.

25. <u>Limits of Liability</u>. The term "Landlord" as used herein shall mean the then-existing holder of fee simple of the Premises from time to time. Neither Landlord nor any affiliate, partner, officer, director, employee or shareholder of Landlord shall have any personal liability for the breach by Landlord of any covenant or agreement contained in this Lease, and none of Tenant's affiliates, partners, officers, directors, employees or shareholders shall have any personal liability for the breach by Tenant of any covenant or agreement contained in this Lease. Tenant shall look solely to Landlord's interest in the Premises for the satisfaction of Tenant's remedies on account thereof. No other property or assets of Landlord shall be subject to lien, levy, execution or other enforcement procedures for the satisfaction of any judgment (or other judicial process) arising out of, or in connection with, this Lease.

26. <u>Insurance</u>.

(a)    At all times during the Term of this Lease, Tenant shall, at Tenant's sole expense, provide and keep in force for the mutual benefit of Landlord, any Landlord mortgagee as requested by Landlord, and Tenant, the following insurance:

(i)    Comprehensive general liability insurance against claims for bodily injury, death or property damage occurring in or about the Premises, (including, without limitation, bodily injury, death or property damage resulting directly or indirectly from any change, alteration, improvement or repair thereof), with limits of no less than $3,000,000 per occurrence and $5,000,000 in the aggregate (if coverage is provided via a blanket or master program covering other locations, with a per location aggregate).

(ii)    Commercial property insurance insuring the Premises against loss by fire, windstorm, sprinkler leakage, earthquake, water damage, terrorism, ordinance or law, equipment breakdown and all of the risks and perils usually covered by a "special form" policy of commercial property insurance, in an amount equal to not less than the full replacement cost of the improvements, as required by Landlord. In addition, Tenant shall obtain plate glass and other insurance reasonably requested by Landlord, all in form and substance and in amounts reasonably acceptable to Landlord;

(iii)    During any construction at the Premises, while this Lease is in effect builder's risk insurance in such form and amount as shall be reasonably required by Landlord; and

-15-

     (iv)    Worker's compensation insurance and employer's liability insurance, to the extent required by Laws and other Governmental Requirements of the State of Ohio, covering all persons employed by Tenant or in connection with any work performed at or about the Premises with respect to whom claims for death or bodily injury could be asserted against Landlord or Tenant.

     (b)    All insurance to be provided and kept in force by Tenant under the provisions of this Lease (except workers' compensation insurance) shall name Landlord and Tenant as the insured, as their respective interests may appear (and, with respect to the commercial property insurance, naming Landlord as loss payee), and shall also name the holder or holders of any mortgages encumbering the Premises as Mortgagee and Lenders Loss Payable (as their interests may appear) under a standard mortgagee non contribution clause or endorsement. Said policies shall be obtained and fully paid for by Tenant, and the originals shall be delivered, prior to the Commencement Date, to Landlord and shall be issued by responsible companies of recognized responsibility licensed to do business in the state in which the Premises are located, and reasonably acceptable to Landlord including having a reasonably satisfactory financial rating. Said policies shall be for a period of not less than one year and shall contain a provision whereby the same cannot be cancelled or modified unless Landlord is given at least 30 days prior written notice of such cancellation or modification (or 10 days for non-payment of premium). Tenant shall procure and fully pay for renewals of such insurance from time to time at least fifteen (15) days before the expiration thereof, and Tenant shall promptly deliver to Landlord the originals or certificates of the renewal policies, as the case may be. Self-insurance is expressly not permitted.

     (c)    Landlord, for itself and its insurers, and Tenant, for itself and its insurers, hereby waive any rights, including rights of subrogation, each may have against the other on account of any loss or damage occasioned to Landlord or Tenant, as the case may be, to their respective property, the Premises, the Building, and the other improvements on the Premises, or the contents therein, that are caused by or result from risks insured against or which could be insured against under a standard extended coverage property insurance policy or under any policies which are carried by the parties hereto and in force at the time of any such damage. The foregoing waivers of subrogation shall be operative only so long as available in the jurisdiction where the Premises are located and only so long as no policy of insurance is invalidated thereby. Each party will obtain any special endorsements, if required by the insurer, to evidence compliance with the aforementioned waiver.

     (d)    Notwithstanding the foregoing, if required by Landlord's mortgagee holding a mortgage on the Premises, Tenant shall be required to escrow for insurance premiums in advance in monthly installments, in which event Landlord shall notify Tenant of such requirement in writing and thereafter Tenant shall pay such insurance premiums requested to be escrowed to Landlord in advance on a monthly basis. The amount of monthly payments to be made by Tenant hereunder shall be estimated by Landlord based on then-existing insurance premiums, and Tenant shall pay such estimated amount in advance monthly as aforesaid as Additional Rent. If at the end of a given year the monthly payments made by Tenant during such year shall be less than the actual amount of insurance premiums then Tenant shall pay such deficiency to Landlord (or Landlord's mortgagee, if said mortgagee so requires) within ten (10) days after written request. If Tenant's monthly payments shall exceed the actual amount of such premiums then such excess shall be applied against the next payment(s) due from Tenant pursuant to this subsection (d).

-16-

27.    <u>Damage or Destruction</u>.

(a)    Tenant shall use reasonable precautions to protect the Premises against fire or other casualty as well as damage to persons and property from vandalism or other criminal behavior. If (i) the Premises or any part thereof shall be damaged by fire or other casualty, or (ii) any personal injury occurs on the Premises, Tenant shall give prompt written notice thereof to Landlord and this Lease shall continue in full force and effect except as hereinafter set forth.

(b)    Tenant, at its sole cost and expense, whether or not such damage or destruction shall have been insured, and whether or not insurance proceeds, if any, shall be sufficient for such repairs, alterations, restorations, replacements, rebuilding, or demolition and removal of rubbish (collectively, the "Restoration"), shall, with reasonable diligence, repair, alter, restore, replace or rebuild the Premises, and remove all rubbish (collectively, "Restore"). Any Restoration must be in compliance with all applicable requirements of law. In no event shall Landlord be required to Restore the Premises or any portion thereof or to pay any of the costs or expenses thereof. If Tenant shall fail or neglect to Restore with reasonable diligence the Premises or the portion thereof damaged or destroyed, or, having so commenced such Restoration, shall fail to complete the same with reasonable diligence in accordance with the terms of this Lease, in each case after notice and cure period as provided elsewhere in this Lease with respect to Tenant defaults, Landlord may complete such Restoration at Tenant's expense and using available insurance proceeds for such Restoration, which shall be payable in full to Landlord. Upon Landlord's election to so complete the Restoration, Tenant promptly shall pay to Landlord all insurance proceeds that may have theretofore been received by Tenant plus the amount of any applicable insurance deductible, less those amounts, if any, which Tenant shall have applied to the Restoration, and if such sums are insufficient to complete the Restoration, Tenant promptly, on demand, shall pay the deficiency to Landlord. Each Restoration shall be done in accordance with the provisions of this Lease.

(c)    Subject to the provisions of this Section 27, Landlord shall pay over to Tenant from time to time, upon the following terms, any proceeds of insurance that may be received by Landlord (collectively, the "Restoration Funds"); provided, however, that Landlord, before paying such moneys over to Tenant, shall be entitled to reimburse itself therefrom to the extent, if any, of the reasonable expenses paid or incurred by Landlord in the collection of such moneys. Landlord shall pay to Tenant the Restoration Funds for the purpose of Restoration to be made by Tenant to Restore the Premises in accordance with and subject to the following terms and conditions:

(i)    Prior to the making of any Restoration Tenant shall furnish Landlord with an estimate of the cost of such Restoration, prepared by a licensed professional engineer or registered architect (the "Architect") reasonably acceptable to Landlord. The Restoration Funds shall be paid to Tenant from time to time thereafter in installments as the Restoration progresses upon application to be submitted from time to time by Tenant to Landlord showing the cost of work, labor, services, materials, fixtures and equipment incorporated in the Restoration, or incorporated therein since the last previous application, and paid for by Tenant or then due and owing. If any vendors' or mechanics' lien is filed against the Premises or any part thereof, Tenant shall not be entitled to receive any further installment until such lien is satisfied or otherwise discharged of record. The amount of any installment to be paid to Tenant shall be such proportion of the total Restoration Funds as the cost of work, labor, services, fixtures and equipment theretofore incorporated by Tenant into the Restoration bears to the total

-17-

estimated cost of the Restoration by Tenant, less all payments heretofore made to Tenant out of the Restoration Funds. Upon completion of and payment for the Restoration, the balance of the Restoration Funds, if any, shall be paid over to Landlord.

(ii)     If the estimated cost of any Restoration exceeds the insurance proceeds received or reasonably expected to be received by Landlord, then, prior to the commencement of such Restoration (or thereafter if at any time it is reasonably determined by Landlord that the cost to complete the Restoration exceeds the unapplied portion of such insurance proceeds), Tenant shall from time to time promptly deposit with Landlord a bond, cash, irrevocable letter of credit or other security reasonably satisfactory to Landlord, as the case may be, in the amount of such excess, to be held and applied by Landlord in accordance with the provisions of this Section 27, as security for the completion of the Restoration and to assure that the Premises are free of vendors' or mechanics' statutory or other similar liens.

(iii)    The following shall be conditions precedent to each payment made to Tenant as provided in this Section 27(c):

(A)  There shall be submitted to Landlord the certificate of the Architect stating (1) that the sum then requested either has been paid by Tenant or is justly due to contractors, subcontractors, materialmen, engineers, architects or other persons (whose names and addresses shall be stated) who have rendered or furnished work, labor, services, materials, fixtures or equipment for the work and giving a brief description of such work, labor, services, materials, fixtures or equipment and the principal subdivisions or categories thereof and the several amounts so paid or due to each of said persons in respect thereof, and stating in reasonable detail the progress of the Restoration up to the date of said certificate; (2) that no part of such expenditures has been or is being made the basis of any previous request for payment; (3) that the sum then requested does not exceed the cost of the work, labor, services, materials, fixtures and equipment in the certificate; (4) that the balance of the Restoration Funds will be sufficient, upon completion of the Restoration, to pay for the same in full, and stating in reasonable detail an estimate of the cost of such completion; and (5) appropriate sworn statements and lien waivers from all persons receiving payment under such draw who have the statutory right to file mechanics', laborers', materialmens', vendors' or similar liens;

(B)  There shall be furnished to Landlord a date down endorsement, or a similar certificate of a title insurance company reasonably satisfactory to Landlord, showing that there are no vendors', mechanics', laborers' or materialmen's or other liens affecting the Premises or any part thereof in connection with work done, authorized or incurred at or relating to the Premises; and

(C)  At the time of making such payment, no default by Tenant under this Lease beyond applicable notice and/or cure period has occurred and is continuing.

(d)     Except as provided in Section 27(f) below, this Lease shall not be terminated, forfeited or affected in any manner, nor shall there be any reduction or abatement of the Base Rent or any other rental payable hereunder, by reason of damage to or total, substantial or partial destruction of the Premises or any part thereof or by reason of the untenantability of the same or any part thereof, for or due to any reason or cause whatsoever, and Tenant, notwithstanding any law or statute present or future, waives any and all rights to quit or

-18-

surrender the Premises or any part thereof; and Tenant's obligations hereunder, including, without limitation, the payment of rent hereunder, shall continue as though the Premises had not been damaged or destroyed and without abatement, suspension, diminution or reduction of any kind.

(e)     The provisions of this Section 27 shall be considered an express agreement governing any case of damage or destruction of the Premises by fire or other casualty, and any applicable law providing for a contingency in the absence of an express agreement, and any other law of like import, now or hereafter in force, shall have no application to the Premises and this Lease.

(f)     If the Premises are rendered wholly unusable by any casualty or are so substantially destroyed that, in each case, reconstruction would reasonably require more than one hundred eighty (180) days from the date of commencement of the same (as determined in the manner hereinafter set forth), and such casualty occurs during the last year of the Term, then Tenant may elect to terminate this Lease by giving Landlord notice of such election within thirty (30) days after the giving of the notice from the Architect to Landlord of the estimated time required to repair, as hereinafter provided. The termination shall be effective on the date set forth in the termination notice, which shall not be less than thirty (30) days nor more than sixty (60) days after the notice of termination. Within thirty (30) days after a casualty described in the first sentence of this subsection, Tenant shall cause the Architect to give Landlord notice of the Architect's good faith estimate of the time required to reconstruct the Premises. In the event of a termination of this Lease pursuant to this Section 27(f), the rent owing shall be paid up to such date and any payments of rent made by Tenant which were on account of any period subsequent to such date shall be returned to Tenant and all of the insurance proceeds, without deduction for any reason, shall be paid to and shall be the sole property of Landlord, and Tenant shall also pay to Landlord the amount of any applicable insurance deductible, if any, plus any excess required to restore the Premises if not fully covered by insurance proceeds for any reason. After the expiration of the periods entitling Tenant to terminate this Lease, and unless this Lease shall terminate as provided for herein, Tenant shall make the repairs and restorations under the conditions of this Section 27. Landlord shall have no duty to repair or restore the Premises or any portion thereof or any alterations, additions or improvements in the Premises made by Tenant, or any of Tenant's personal property, and Landlord shall not be liable for damages of any kind in the event that Tenant's possession of the Premises is interrupted or terminated by fire or other casualty.

(g)     Nothing contained hereinabove shall relieve Tenant from liability that may exist as a result of damage from fire or other casualty. Tenant acknowledges that Landlord will not carry insurance on Tenant's furnishings, fixtures or equipment, improvements, or appurtenances removable by Tenant and agrees that Landlord shall not be obligated to repair any damage thereto or replace the same.

28.     Condemnation.

(a)     If, at any time during the Term of this Lease, title to the whole or substantially all of the Premises shall be taken by the exercise of the right of condemnation or eminent domain or by agreement between Landlord and those authorized to exercise such right, this Lease shall terminate and expire on the date of such taking and the rent shall be apportioned and paid to the date of such taking. For purposes of this Section 28, "substantially all of the Premises" shall be deemed to have been taken if, in the reasonable opinion of Tenant acting in good faith, the remainder of the Premises cannot be economically used or converted for use for the purpose for which the Premises were being used immediately prior to the taking.

-19-

(b)    In the event of the taking of the whole or substantially all of the Premises, the entire award, without deduction therefrom for any reason whatsoever, shall be paid to and shall be the sole property of Landlord.

(c)    If a condemnation results in the taking of less than the whole or substantially all of the Premises (a "Partial Condemnation"), this Lease shall continue in full force and effect, and Tenant shall (to the extent of the net award made available to Tenant by Landlord) promptly make all repairs, reconstruction, restoration and other work necessary so that the Premises shall constitute a complete rentable structure to as nearly as may be practicable to its value, condition and character immediately prior to the Partial Condemnation, including, without limitation, comparable access to and from the Premises. The entire proceeds of the award in respect of a Partial Condemnation, after the payment of all reasonable third party fees and expenses incurred in connection with the collection of such award, shall be paid to Landlord, and Landlord shall hold, apply and pay over the same to Tenant in accordance with the provisions of Section 27(c) towards the cost of demolition, repair and restoration. Any balance remaining in the hands of Landlord after payment of such costs of demolition, repair and restoration as aforesaid, if any, shall be retained by Landlord.

(d)    If title to less than the whole or substantially all of the Premises shall be taken as aforesaid, this Lease shall continue, except that thereafter, the Base Rent shall be appropriately adjusted to account for the amount of rentable square feet at the Premises lost as a result of such taking. In no event shall there be any other reduction of amounts required to be paid by Tenant pursuant to this Lease.

(e)    Nothing contained in this Section 28 shall be construed to preclude Tenant from prosecuting any separate claim directly against the condemning authority in such condemnation proceedings for its trade fixtures, furniture and other personal property belonging to Tenant or any moving expenses or loss of business incurred by Tenant as a result of a condemnation; provided, that Tenant shall neither have nor make any claim whatsoever for any award or payment for the Premises or any part thereof, and in any event Tenant shall neither have nor make any claim whatsoever for any award or payment for the value of Tenant's leasehold estate (or the value of the unexpired term of this Lease); provided, further, that no such claim shall diminish or otherwise adversely affect Landlord's award.

(f)    If the whole or any part of the Premises, or of Tenant's leasehold estate under this Lease, shall be taken or condemned for temporary use or occupancy by any competent authority for any public or quasi-public use or purpose, the foregoing provisions of this Section 28 shall not apply and Tenant shall continue to pay, in the manner and at the times herein specified, the full amounts of the Base Rent and other rental payable by Tenant hereunder, and, except only to the extent that Tenant may be prevented from so doing pursuant to the terms of the order of such authority, Tenant shall perform and observe all of the other terms, covenants, conditions and obligations of this Lease on the part of Tenant to be performed and observed. Tenant shall be entitled to receive the entire award for such taking or condemnation unless the period of temporary use or occupancy extends beyond the termination of the term of this Lease, in which case such taking or condemnation proceeds shall be apportioned between Landlord and Tenant upon receipt thereof as of the date of termination of this Lease. Tenant shall, upon the expiration of any such period of temporary use or occupancy during the term of this Lease, restore the Premises as nearly as may be practicable to its value, condition and character immediately prior to such taking or condemnation. Any portion of the condemnation proceeds received by Tenant as compensation for the cost of restoration of the Premises shall, if such

-20-

period of temporary use of occupancy shall extend beyond the term of this Lease, be paid to Landlord on the date this Lease terminates. to the extent not theretofore disbursed by Tenant in connection with restoration of the Premises and Tenant shall have no further obligation to restore the Premises under this Section 28(f).

29,   Indemnification.

(a)   Subject to the provisions of Section 26(c), Tenant shall at its expense, indemnify, defend and hold harmless Landlord, its officers, directors, shareholders, employees, partners and principals and the holder of any mortgage on the Premises against and from any and all claims by or on behalf of any person, firm or corporation, arising from or in connection with (a) the conduct or management of, and the payment for, any work or thing whatsoever done in or about the Premises by or on behalf of Tenant (or any person holding or claiming through or under Tenant) during the Term of this Lease; (b) the condition of the Premises during the Term of this Lease, or any use, nonuse, possession, management or maintenance of the Premises; (c) any breach or default on the part of Tenant in the performance of any of Tenant's covenants or obligations under this Lease; (d) any act, negligence or fault of Tenant; or any of its agents, servants, employees, contractors, invitees or licensees, or of any person holding or claiming through or under Tenant; and/or (e) any accident, injury or damage whatsoever caused by Tenant to any person, and/or any damage to personal property, occurring during the Term of this Lease in or about the Premises. Further, Tenant agrees to indemnify, defend and hold harmless Landlord, its officers, directors, shareholders, employees,  partners and principals and the holder of any mortgage on the Premises against and from all costs, reasonable counsel fees, expenses and liabilities incurred in connection with any such claim and any action or proceeding brought thereon; and in case any action or proceeding shall be brought against Landlord, its officers, directors, shareholders, employees, partners or principals on the Premises by reason of any such claim, Tenant, upon notice, agrees to resist or defend such action or proceeding unless Tenant causes the same to be discharged and satisfied. The foregoing indemnification shall not extend to claims arising out of Landlord's gross negligence or willful misconduct. If Tenant fails to resist or defend any such action as required above. Landlord (at Landlord's option, but without being obligated to do so) may, at the expense of Tenant and upon notice to Tenant, defend such actions and Tenant shall pay and discharge any and all judgments that arise therefrom, which obligation shall survive termination of this Lease.

(b)   Subject to the provisions of Section 26(c), Landlord shall at its expense, indemnify, defend and hold harmless Tenant. its officers, directors, shareholders, employees, partners and principals against and from any and all claims by or on behalf of any person, firm or corporation, arising from or in connection with (a) any breach or default on the part of Landlord in the performance of Landlord's covenants or obligations under this Lease; and (b) any accident, injury or damage whatsoever caused by Landlord to any person, and/or any damage to personal property, occurring during the Term of this Lease in or about the Premises as a result of Landlord's exercise of its right to enter the Premises pursuant to and for the purposes set forth in Section 14 of this Lease. The foregoing indemnification shall not extend to claims arising out of Tenant's gross negligence or willful misconduct. If Landlord fails to resist or defend any such action, Tenant (at Tenant's option, but without being obligated to do so) may, at the expense of Landlord and upon notice to Landlord, defend such actions and Landlord shall pay and discharge any and all judgments that arise therefrom, which obligation shall survive termination of this Lease.

30.   As Is.  Tenant has examined the Premises and is fully familiar with the physical condition thereof, and except as otherwise expressly provided for in this Lease, Tenant

-21-

accepts the same "AS IS", "WHERE IS" on the date of this Lease. Except as expressly set forth to the contrary in this Lease, Tenant assumes all risks, if any, resulting from any latent or patent defects in the Premises, and Landlord has made no representations or warranties in respect of the physical condition, title or the zoning of the Premises or any other matter or thing affecting or related to the Premises.

31.  Broker.  Landlord and Tenant represent and warrant to each other that no broker was involved in consummating this Lease other than Food Properties Group (the "Broker") and there are no claims for brokerage commissions or finder's fees in connection with the execution of this Lease, except with respect to such Broker. Landlord shall pay Broker pursuant to a separate written agreement. Each party agrees to indemnify, defend and hold harmless the other against all liabilities and costs arising from any breach of the foregoing representation and warranty, including, without limitation, reasonable attorneys' fees in connection therewith.

32.  Counterparts; Electonic Signatures.  This Lease may be executed in multiple counterparts, each of which shall be deemed an original for all purposes and shall separately or together constitute one and the same document. Counterparts of this Lease signed and transmitted by facsimile or pdf electronic transmission shall have the same force and effect as original signed documents.

33.  Captions.  The captions used in this Lease are inserted as a matter of convenience and for reference and in no way define, limit or describe the scope of this Lease or the intent of any provision of this Lease.

34.  Successors and Assigns.  The provisions of this Lease shall bind and inure to the benefit of Landlord and Tenant and their respective heirs, representatives, executors, administrators, successors, and their permitted assigns. In the event of any good-faith, arms-length sale or transfer of the Premises by Landlord, Landlord shall be relieved from all obligations and liabilities under this Lease, except such obligations and liabilities as shall have arisen by act of Landlord, or any liabilities which shall have accrued against Landlord during Landlord's actual period of ownership, and in such event, Landlord shall be entitled to transfer Tenant's security deposit, if any, and Tenant will thereafter only look to the transferee for return of said security deposit.

35.  Unenforceability.  If any provision of this Lease shall be found by a court of competent jurisdiction to be invalid or unenforceable under the present or future laws effective during the Term of this Lease, then and in that event, it is the intention of the parties hereto that the remainder of this Lease shall not be affected thereby, and that each and every provision of this Lease shall be enforceable to the fullest extent permitted by law, and it is also the intention of the parties to this Lease that in lieu of each clause or provision of this Lease that is invalid or unenforceable, there be added as a part of this Lease a clause or provision that is as close in content and substance to the severed provision as may be possible and be legal, valid and enforceable so as to effect the intention of the parties.

36.  Miscellaneous.

(a)  No payment by Tenant or receipt by Landlord of any amount less than the full rental provided in this Lease shall be deemed anything other than a payment on account of the earliest rental due; no endorsement or statement on any check or any letter accompanying any check or payment of rental shall be deemed an accord and satisfaction of

-22-

Landlord; and Landlord may accept any such check or payment from Tenant without prejudice to Landlord's right to recover the balance of rental or to pursue any other right or remedy provided under this Lease or by law.

(b)    This Lease, together with the exhibits to this Lease, contains all the terms, covenants and conditions between the parties hereto and may not be changed, modified or terminated in whole or in part, other than by an agreement, in writing, signed by all of the parties to this Lease. No provision of this Lease shall be deemed to have been waived by either party unless such waiver is in writing signed by the party to be charged with such waiver, nor shall any custom or practice which may arise between the parties in the administration of the provisions of this Lease be construed to waive or lessen the right of either party to insist upon future performance in strict accordance with the provisions of this Lease. Neither the acceptance of the keys nor any other act of Landlord or any agent or employee of Landlord shall be deemed an acceptance of a surrender of the Premises, unless in a written instrument signed by Landlord accepting a surrender.

(c)    Tenant hereby acknowledges that late payment by Tenant to Landlord of Base Rent, Additional Rent and/or any other sums due under this Lease will cause Landlord to incur costs not contemplated by this Lease, the exact amount of which are difficult to ascertain but include, without limitation, processing and accounting charges. Accordingly, if any installment of Base Rent, Additional Rent or any other sum due from Tenant shall not be received by Landlord within five (5) days of the date due, then without prejudice to Landlord's rights and remedies in respect of such default (all of which are reserved to Landlord) Tenant shall pay to Landlord a late charge equal to five percent (5%) of such amount overdue plus any reasonable attorneys' fees incurred by Landlord by reason of Tenant's failure to pay such rental and/or other charges when due. The parties agree that such late charge represents a fair and reasonable estimate of the costs that Landlord will incur by reason of the late payment by Tenant and is not a penalty, and that acceptance of such late charge by Landlord shall in no event constitute a waiver of Tenant's default with respect to such overdue amount, nor prevent Landlord from exercising any of the other rights and remedies granted hereunder. The late charge shall be deemed Additional Rent and the right to require it shall be in addition to all of Landlord's other rights and remedies hereunder or at law and shall not be construed as liquidated damages or as limiting Landlord's remedies in any manner.

(d)    Any delay or failure of Landlord in billing any Base Rent or Additional Rent or Other Expenses shall not constitute a waiver of or in any way impair the continuing obligation of Tenant to pay same.

(e)    Any obligation of Landlord or Tenant which by its nature or under the circumstances can only be, or by the provisions of this Lease, may be performed after the expiration or earlier termination of this Lease, and any liability for a payment which shall have accrued to or with respect to any period ending at the time of expiration or termination, unless expressly otherwise provided in this Lease, shall survive the expiration or termination of this Lease.

(f)    Words of any gender used in this Lease shall be held and construed to include any other gender, and words in the singular number shall be held to include the plural, unless the context otherwise requires. This Lease shall be construed without regard to the identity of the party who drafted the various provisions hereof. Furthermore, each and every provision of this Lease shall be construed as though all parties participated equally in the drafting of such provisions. As a result, any rule of construction that a document is to be construed

-23-

against the drafting party shall not be applicable to this Lease. The parties agree that each has contributed, through negotiation and otherwise, to the final version of this Lease and that any rule of interpretation by which ambiguities or discrepancies are to be construed against the drafting party shall be invalid and inapplicable as to the interpretation of this Lease.

(g)     In any action or proceeding by either party to enforce its rights under this Lease, the prevailing party shall be entitled to recover from the other the prevailing party's reasonable costs and expenses in such action or proceeding, including reasonable attorneys' fees. In the event either party is sued by a third party as a result of a breach of a covenant, warranty or other agreement contained in this Lease made by the other party hereto (or which, if adversely determined, would amount to such a breach), then the party who has breached the covenant, warranty or agreement shall be responsible for the reasonable costs incurred by the non-breaching party in such action or proceeding, including reasonable attorneys' fees.

(h)     The submission of this Lease by one party to the other for examination, review or negotiation does not constitute a reservation of or offer or option for the Premises, and this Lease shall become effective only upon execution by Landlord and Tenant.

(i)     When used in this Lease the terms "shall" or "will" are mandatory words denoting an obligation to pay or perform. "May" is a permissive word denoting an option. The term "including" when following any general statement, will be construed to mean "without limitation", and be deemed to refer to all other items which could reasonably fall within the scope of the referenced general statement.

(j)     Except as otherwise expressly provided in this Lease, where pursuant to the terms of this Lease or in connection with the administration of this Lease, the consent or approval of one party shall be required, requested or appropriate, such party covenants and agrees that its consent or approval shall not be unreasonably withheld, delayed or conditioned, and that the requesting party shall not be charged for such consent or approval.

(k)     Time shall be deemed of the essence under this Lease and with respect to all of the provisions thereof and with respect to the performance of each of the covenants and agreements contained in this Lease.

37.     Governing Law. This Lease shall be governed by, construed, and enforced in accordance with the law of the State of Ohio, without regard to its conflicts of laws principles.

38.     Prohibition Against Hazardous Substances.

(a)     Tenant shall not cause or permit any Hazardous Substances (as defined below) to be used, stored, transported, released, handled, produced or installed in, on or from the Premises, except in strict compliance with all applicable environmental laws, rules and regulations. "Hazardous Substances", as used herein, shall mean any flammables, explosives, radioactive materials, hazardous wastes, hazardous and toxic substances or related materials, asbestos or any material containing asbestos or any other substance or material defined as being hazardous or toxic by any Federal, state or local law, ordinance, rule or regulation including, without limitation, the Comprehensive Environmental Response Compensation and Liability Act of 1980, as amended, the Hazardous Materials Transportation Act, as amended, the Resource Conservation and Recovery Act, as amended, and in the regulations adopted and publications promulgated pursuant to each of the foregoing, and Tenant shall comply with same. Tenant shall

-24-

indemnify, defend and hold harmless Landlord, and its successors, assigns, and each of their partners, employees, agents, officers and directors from and against any claims, demands, penalties, fines, liabilities, settlements, damages, losses, costs or expenses of whatever kind or nature, known or unknown, contingent or otherwise, including, but not limited to, reasonable counsel and consultants' fees and disbursements and investigation and laboratory fees arising out of, or in any way related to:

        (i)   the presence, disposal, release or threat of release of any Hazardous Substance after the Commencement Date as a result of any act or omission of Tenant, its agents, employees, tenants, subtenants, invitees or other occupants of the Premises, in, on, over, under, to or from or affecting the Premises or the soil, water, vegetation, personal property or individuals or animals thereon;

        (ii)   any personal injury (including wrongful death) or property damage (real or personal) arising out of or related to any such Hazardous Substance;

        (iii)   any lawsuit brought or threatened, settlement reached or government order relating to such Hazardous Substance; and

        (iv)   any violations of laws, orders, regulations, requirements or demands of governmental authorities (or of the Permitted Encumbrances) by Tenant relating to such Hazardous Substances.

        (b)   Tenant shall notify Landlord promptly upon receipt of knowledge of any Hazardous Substance in, on, over, under, or affecting the Premises and shall cooperate with Landlord in the performance of each party's obligations under this Section 38.

        (c)   The obligations of Landlord and Tenant set forth in this Section 38 shall survive the termination of this Lease.

        39.    <u>Memorandum of Lease</u>. The parties hereto agree to execute in recordable form a Memorandum of Lease in form satisfactory to both parties which shall, after execution, be recorded by Tenant at Tenant's expense in the Recorder's Office of the County of Franklin, Ohio and which shall include record notice of Tenant's Option rights as well as confirmation of the Expiration Date, it being the intention of the parties that this Lease Agreement will not be recorded.

[Signatures Appear on the Following Page]

-25-

IN WITNESS WHEREOF, the parties have executed this Lease as of the date first above written.

LANDLORD:

ONE LIBERTY PROPERTIES, INC., a Maryland corporation

By: _____

Name: ___Lawrence G. Ricketts_____
        Executive Vice President

Title: _____


TENANT:

ORLANDO BAKING COMPANY, an Ohio corporation

By: _____

Name: JOHN A. ORLANDO

Title: VICE PRESIDENT

-26-

<u>ACKNOWLEDGEMENTS:</u>

STATE OF NEW YORK   )
          ) ss.:
COUNTY OF  NASSAU  )

  On the **13** day of November in the year 2017 before me, the undersigned, personally appeared Lawrence G. Ricketts, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

> RICHARD M. FIGUEROA
> Notary Public, State of New York
> Registration #02FI5073484
> Qualified In New York County
> Commission Expires April 23, 20**19**

                Notary Public


STATE OF OHIO     )
          ) ss.:
COUNTY OF _Cuyahoga_ )

  On the *3rd* day of November in the year 2017 before me, the undersigned, personally appeared _John A. Orlando_, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.



    JOHN C. ORLANDO JR.
     Attorney At Law
    NOTARY PUBLIC
    STATE OF OHIO
   My Commission Has
    No Expiration Date
   Section 147.03 O.R.C.

                Notary Public

Electronically Filed 08/18/2022 14:31 / / CV 22 967616 / Confirmation Nbr. 2631070 / CLJSZ

EXHIBIT A

Legal Description

July ___, 1977

DESCRIPTION OF A 6.370 ACRE TRACT
NORTH OF BROAD STREET, EAST OF McCORMICK BOULEVARD
COLUMBUS, OHIO

Situated in the State of Ohio, County of Franklin, City of Columbus, Quarter Township 3, Township 1, Range 16, United States Military Lands, and being a part of Lot 6 in COLUMBUS INDUSTRIAL PARK, of record in Plat Book 48, Pages 79 and 80, Franklin County Recorder's Office, and being more particularly described as follows:

Beginning at an iron pin at the southeasterly corner of a 16.284 acre tract described in a deed to Metal Container Corporation, of record in Deed Book 3509, Page 903;

Thence S 3° 04' 57" W, through Lot 6 with a line which is 50.00 feet westerly from (as measured at right angles) and parallel to the easterly line of Lot 6, a distance of 523.63 feet to an iron pin;

Thence S 72° 52' 10" W, with a line which is 490.00 feet southerly from (as measured at right angles) and parallel to the southerly line of the aforementioned 16.284 acre tract, a distance of 474.00 feet to an iron pin;

Thence N 17° 07' 50" W, a distance of 490.00 feet to an iron pin in the southerly line of said 16.284 acre tract;

Thence N 72° 52' 10" E, with said southerly line, a distance of 658.63 feet to the place of beginning, containing 6.370 acres, more or less.

## EXHIBIT B

Floor Plan Delineating the West Side Refrigeration System

Electronically Filed 08/18/2022 14:31 /  / CV 22 967616 / Confirmation Nbr. 2631070 / CLJSZ





**NAILAH K. BYRD**
**CUYAHOGA COUNTY CLERK OF COURTS**
1200 Ontario Street
Cleveland, Ohio 44113

**Court of Common Pleas**

**New Case Electronically Filed: COMPLAINT**
**August 18, 2022 14:31**

By: KYLE A. SHELTON 0092083

Confirmation Nbr. 2631070

ORLANDO BAKING COMPANY                    CV 22 967616

.vs.

ONE LIBERTY PROPERTIES, INC.              **Judge:** JOHN D. SUTULA

Pages Filed:  5



BRYAN
CAVE
LEIGHTON
PAISNER

BRYAN CAVE LEIGHTON PAISNER LLP
161 North Clark Street  Suite 4300
Chicago  IL 60601 3315
T: +1 312 602 5000
F: +1 312 602 5050
www.bclplaw.com

Brian A. Sher
Partner
Direct: 312/602-5070
Fax: 312/698-7470
brian.sher@bclplaw.com

September 2, 2021

**VIA FEDERAL EXPRESS**

Orlando Baking Company
Attn: John Anthony Orlando
7777 Grand Avenue
Cleveland, OH 44104

Brouse McDowell L.P.A.
Attn: Daniel L. Silfani
388 South Main Street, Suite 500
Akron, OH 44311

Re:  Notice of Default and Demand

Dear Mr. Orlando:

One Liberty Properties, Inc. ("**OLP**") and Orlando Baking Company ("**Tenant**") (collectively, the "**Parties**") entered into a Lease Agreement, dated November 3, 2017 (the "**Agreement**") in relation to the property commonly known as 6660 Broughton Avenue, Columbus, Ohio (the "**Premises**"). The Lease Agreement was amended by the First Amendment to Lease Agreement (the "**Amendment**") dated July 12, 2021 (collectively with the Lease Agreement, the "**Lease Documents**"). Our Firm represents OLP in connection with the aforementioned Premises. Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Lease Documents.

**NOTICE OF DEFAULT**

An Event of Default has occurred under the Lease Documents and is continuing as a result of Tenant's failure to keep all aspects of the Premises in good condition and repair throughout the term of the lease as called for in Section 8 of the Lease Agreement. Tenant's obligations extend to maintenance, repair and replacement of all building systems.

Sections 8 (a) and (b) provide (emphasis added):

8.  **Maintenance and Repairs; Covenant Against Waste; Inspection.**

(a) Tenant's Maintenance and Repair Obligations: Tenant shall, at all times during the Term and at Tenant's sole cost and expense, maintain, repair and make replacements to the Premises to keep same at all times in good condition and repair, including, but not limited to, all required maintenance, repair and replacements to the roof of the Premises, the building's foundation system and all structural portions of the building located on the Premises, maintaining and repairing all electrical and gas lines and all other structural



PLAINTIFF'S
EXHIBIT

**2**

Orlando Baking Company
September 2, 2021
Page 2


BRYAN
CAVE
LEIGHTON
PAISNER

and non-structural repairs and replacements to the Premises and all building systems serving the Premises of whatever kind and nature and howsoever arising, whether foreseeable or unforeseeable, and at the Expiration Date or sooner termination of the Term of this Lease, Tenant shall yield and deliver the same to Landlord in good condition and repair and otherwise in the condition required by this Lease. Tenant shall keep all aspects of the Premises in good condition throughout the Term including making replacements as and when necessary, shall operate and keep the Premises in a clean and sanitary condition according to all applicable laws and codes and shall maintain all of the curbs, sidewalks and parking areas that are included in the Premises in good order and repair including without limitation periodic replacement, re-striping and re-surfacing as necessary. Tenant shall keep (and make available to Landlord upon Landlord's reasonable request) all records of repair, maintenance or replacement at the Premises. Further, at all times during the Term of this Lease as same may be extended, Tenant shall engage a reputable heating, ventilating and air conditioning (HVAC) contractor and refrigeration contractor, at Tenant's expense, to regularly inspect, maintain and repair the HVAC and refrigeration systems servicing the Premises pursuant to a written service contract for same, which contractor must be reasonably satisfactory to Landlord, and Tenant shall be responsible for all repairs made to the HVAC and refrigeration systems other than as expressly made Landlord's responsibility pursuant to Section 8(b) below. Landlord shall be supplied with copies of the maintenance contract and all renewals of same, and all inspection reports. Tenant shall not perform any acts or carry on (or permit any of its employees, agents or invitees to carry on) any practices which may injure the Premises, and shall not commit or suffer any waste with respect to the Premises. If Tenant does not comply with the provisions of this Section and such failure to comply continues after thirty (30) days written notice of same from Landlord (except in the case of an emergency, in which event no such notice shall be required), then same shall constitute an Event of Default by Tenant under this Lease and, in addition to Landlord's other rights and remedies with respect to such default, Landlord may (but shall not be obligated to) enter upon the Premises and perform any repair, maintenance or replacement which Landlord reasonably deems necessary, in which event Tenant shall pay all costs that Landlord may incur for such repair, maintenance or replacement. Other than as permitted in Section 7 above, Tenant shall not make any other alterations, additions or improvements to the Premises without Landlord's prior written consent and approval, and all alterations, additions or improvements made upon the Premises, except movable furniture and trade fixtures put in at the expense of Tenant, shall be the property of Landlord and shall remain upon and be surrendered with the Premises at the Expiration Date or sooner termination of this Lease.

(b) Landlord's Maintenance and Repair Obligations: Landlord shall have no maintenance, repair or replacement obligations with respect to the Premises, all of same being Tenant's sole responsibility at Tenant's sole cost and expense as set forth above. However, and notwithstanding the foregoing, (i) Landlord shall deliver the Premises to Tenant with all components of the West Side Refrigeration System in working order and condition and (ii) solely during the first thirty (30) days of the Term (but not thereafter), Landlord shall be

Orlando Baking Company
September 2, 2021
Page 3



responsible to pay any reasonable cost and expense incurred during such period in connection with making required repairs to the West Side Refrigeration System to maintain same in working order and condition as required up to a maximum expenditure by Landlord of Twenty-Five Thousand Dollars ($25,000.00).

As is clear from Section 8, Tenant assumed all obligations associated with maintaining the Premises in good condition and repair while Landlord's obligations were limited to certain specific repairs during the first thirty days of the lease term. Section 8 does not simply obligate Tenant to return the premises to Landlord in the same condition as existed at the commencement of the lease, but rather to maintain, repair and make replacements necessary for the Premises to be brought up to and maintained in good condition throughout the lease term.

As you are aware, OLP has been marketing this property for sale and, in connection with these marketing efforts, learned that Tenant has failed to comply with its Section 8 obligations. Landlord has not conducted an exhaustive inspection of the Premises to determine the full scope of Tenant's failures, however, it has identified several items which are set forth in the attached list of known deficiencies and expects that a more detailed inspection will result in the identification of additional repair and maintenance failures. Although Tenant is responsible for repairing, maintaining and/or replacing all of the items set forth on the list (as well as other undiscovered items), of significant concern is the fire safety sprinkler system, which, apparently, has not been functioning for the past year. While the precise total cost of all of the work necessary to bring the Premises up to good condition is, as of yet, unknown, it is estimated to be several million dollars. Landlord recently has been forced to make a significant price reduction (in excess of $2.3 million) to a prospective purchaser following inspection of the Premises; this $2 million + price reduction is on top of the already decreased price associated with the sale of the Premises in less than good condition.

OLP hereby demands that Tenant cure the foregoing Event of Default upon receipt of this notice and commence all of the required and necessary repairs within thirty (30) days. In the event Tenant does not bring the Premises into good condition as required under the Lease, OLP will pursue its legal rights by seeking recovery of the damages associated with Tenant's breach. Tenant is further advised that, in accordance with Section 36(g) of the Lease Agreement, Tenant is responsible for reasonable costs and expenses (including attorneys' fees) related to OLP's enforcement of its rights.

## RESERVATION OF RIGHTS

There may be additional defaults or Events of Default under the terms of the Lease Documents, and OLP does not waive any right to call any such defaults in the future and hereby reserves all rights and remedies against Tenant as a result thereof. OLP reserves all rights and remedies under the Lease Documents and under applicable laws and in equity, in connection with the foregoing Event of Default, and further reserves all rights and remedies with respect to any other defaults now or hereafter in existence, whether known or unknown. Nothing contained herein may be construed as the creation of a course of dealing or course of performance that would entitle Tenant to any notices or demands with respect to any such matters going forward.

Orlando Baking Company
September 2, 2021
Page 4



If you would like to discuss this matter, please reach out to me or Larry Ricketts.

Very truly yours,

Brian A. Sher
Attachment

**One Liberty Properties, Inc**
**Orlando Bakery**
**Columbus, OH**

**List of Known Deficiencies**

Parking Lot Replacement
        Truck Parking Lot (areas in red on site plan)
        Car Parking Lot (areas in blue on site plan)
        Concrete Loading Dock Pads (areas in purple on site plan)

Restore Entire Fire Sprinkler System, including Risers 1-7, 6" Tyco Riser, and Air Compressor to good working order.

Restore Entire Fire Alarm System to good working order.

Restore Any and All Components/Equipment of Heating, Ventilation, Air Conditioning, and Refrigeration Systems to good working order.

Repair/Replace all damaged areas of the concrete floor slab throughout the building.

Repair/Replace all damaged interior metal wall panels throughout building.

Repair/Replace all damaged exterior man doors.

Repair/Replace all damaged loading dock components, including but not limited to, the loading dock doors and tracks, loading dock seals, loading dock bumpers, pit levelers, and vehicle restraints.

Repair/Replace all non-functioning and/or damaged high-speed roll-up freezer and man doors, including restoring electric heaters for doors to prevent freezing.

Scrape and paint all rusted interior steel columns.

Repair multiple ammonia leaks in engine room equipment.

Repair/replace extensive damage to men's room floor.

Repair all existing roof leaks.

Repaint all exterior surfaces, including but not limited to, the stained and peeling exterior walls, bollards, doors, railings, fire sprinkler valves, and light poles.

Repair/replace damaged exterior concrete staircase.